Good morning, Your Honor. This is David Peters on behalf of Peters & Freedman. I think after reflecting on this for a couple of years, I still don't really get the basis for the disqualification or the basis for the contempt. You know, in looking at the law, the law has to relate back to the facts, and the facts in this case are almost non-existent. You're referring to this alleged attorney-client relationship, which you'd have to have confidentiality in four public open meetings, a developer's transition checklist that if you read the checklist, it provides that the, you know, it obviously didn't even come directly from counsel or admittedly to any developer representative, but it talks about a list of construction subcontractors. Now, how would be giving those kinds of documents, how does that developer's checklist even remotely help a builder? It helps a homeowners association obtain information, which is power, from a builder. How did your firm get this work? The developer's transition checklist? We put that together. Oh, I mean, how did your firm become the attorney for the homeowners association? Let me ask you about the retainer agreement. You had sent out a proposal, I believe, if I recall correctly. The cover letter was sent to the board of directors, and my copy of the actual retainer agreement doesn't have any signatures on it, but it's intended to be signed by a board member with a title. Do you recall who that was, or have a copy that's there? No, and see, that's actually a good question, because it explains the scant nature of the representation during that time period. We send over the agreements. I'm not so sure that I, who signed it, why it was signed, you know, and the amount of work that was performed during that time period when the developer's control was very, very small. We're talking about attendance at four board meetings. Well, no, the reason I was curious on that is that it was actually signed by one of the Centex employees in their capacity as an HOA board member wearing that hat instead of the Centex employee hat, and that would be a fact to look at. Well, and that gets to the Ravens Cove case, and the Ravens Cove case simply states, and correctly states, is that when you're a member or director of a corporation, you have fiduciary obligation to that corporation, even as the detriment of the association. So, you know, in representing associations, we don't look to the individual directors. In fact, individual directors are people that we sue, frankly, on a regular basis because the corporation is a separate legal entity. The misfeasance or malfeasance of a director is separate and distinct. The other real point that I'd like to bring up regarding Centex is Centex is a very sophisticated big builder. I mean, the concept that they would be relying upon the advice of Peterson Friedman in this context, it's just devoid of evidence. Getting back to the evidence, though, and I think that's the genesis of the argument here. I mean, all the law about appearance and propriety, et cetera, it's got to relate back to the evidence, and all we have here is attending four board meetings. This is admittedly a draft letter that may or may not have been sent, which is irrelevant anyway because it would be about a management contract, which that has nothing to do with what Centex was sued on. A conversation with Jane Corello about her potentially serving as an officer, all that does is expose the Centex potentially to liability from the homeowners association by virtue of the fact that if she's an office of the corporation, she owes the duty to the corporation, and I believe that's it. And for those reasons, we got disqualified. Moving on to the contempt, I'm sitting here thinking to myself, what would I do knowing what I... You really had... I mean, you're representing the homeowners association. In that capacity, you had no, from what I understand, you had no contact with the developer. You never represented him. No, never. No, and so the only indirect contact you may have had was the director, the developer, had, in a sense, had control of the homeowners association because the director had on that association the majority of... I mean, the developer had on that association the majority of the members were employees of the director. Correct. And the board, yeah. But you're representing the entity of the board. The corporation and the individual directors owe an obligation to that corporation, and if you take a look at the likely defendants from a corporation, there's really three categories. One is the members, for example, like non-payment of assessments. Two would be a builder, and three is the directors. That represents about 99% of the potential defendants. That corporation, the fiduciary obligation to protect, maintain, enhance the value of the corporation is something that is the director's responsibility. The fact here in this particular case, though, what we're getting back to is literally no facts. All we have is conjecture that there is any advice, anything, directly or even directly, related to the lawsuit that was later brought against them. I just don't get it. Now, I see conclusions about advice regarding budgeting and reserves, but there's no evidence. There's nothing in the record. I see conclusions that this developer transition checklist somehow benefited the builder. I can't imagine how a builder is benefited by having a document that says no homeowners association should be provided a complete list of construction subcontractors and principals in each company. This document came from a seminar indirectly to management, and it's for these reasons we've been disqualified. Let me ask you this. When you are retained to represent an association, do you ever advise the board of what their duties are? Yes, all the time. Is that included in your representation of the association? It's like any attorney's. It's included if it's asked. If you were asked to come render legal advice, then absolutely. In this case, it's a very benign, quiet relationship. No one asked. If a director, if you sue Syntex on the basis that the directors violated their fiduciary duties, would Syntex be likely or the directors be likely to counter claim against your firm on grounds that you misadvised them about their fiduciary duties? That situation has never come up. Am I just asking you legally, theoretically? I don't know. I have never heard of it and seen it, and I've been doing this about 20 years. I think a lot of it has to do with if you're giving advice, you give advice to the corporation as a whole. I mean, it's this mythical single entity called the majority of the board that runs a corporation, has the duty to the corporation. I'd like to briefly touch on the contempt before we go on. You have a construction defect case that we're suing Syntex on. You have a reserve case we're suing Syntex on. He's been going on for over a year. And good, bad, or indifferent, we get disqualified from representing the association in the federal action. Now, that's a pretty severe thing. We researched the heck out of it. And the research, which was labeled or corroborated by the court, indicates that one disqualification doesn't disqualify the other. So then we find out that the law firm in the federal action has some 690 attorney-client privilege documents and will not give them back, period. That becomes a basis as to meddling. Well, the federal magistrate a couple months later, several months later, actually agrees that, you know, they have to give those documents back. I don't know what a law firm should do. I can't imagine being faced with a concept of another law firm having that many attorney-client privilege documents and not do anything about it. Asking for a discovery referee, I would actually like to know guidance because, you know, what do you do? I think you fall below the standard of care if you don't try to get those documents back. Well, these were documents that were all set by some stupid oversight. Is that what happened? Well, you know, it was a stupid oversight. Well, the answer is yes. Yes. And so you wanted to get them back. They shouldn't have been sent in the beginning. Well, they weren't sent. The law firm in the federal case went and subpoenaed documents from the Goldman Management Company. And the party that sought to comply with that subpoena just sent all that stuff over there and then included these documents that shouldn't have been sent there. And to me, the inquiry should have ended there. When we asked Centex to say give them back, they said, no, you've waived attorney-client privilege, and this went all the way up to a federal magistrate. So we pursued protecting our client from their wrongful obtaining documents, which we were vindicated by the federal magistrate that they should not have had them. People get inadvertent documents all the time, and I don't fault any for it. But when you ask and they say no, what does an attorney do? A competent attorney should be taking all efforts they can to try to protect their client, which is to get the documents back, and that's what we did. Now, what about this reserve fund you talked about? Well, that's a very good question because this reserve fund, I defy anybody to find a single piece of evidence other than the conjecture that there was any advice ever given by our firm regarding the reserve fund. I mean, all you have is conjecture. No, let me ask you a question. There was a reserve fund, was there not, that the association had? Absolutely. Yeah, and that money was under the control of Centex for a while. It was under the control of the board of directors. Under the control of the board of directors. What happened to that money? During that time period, I wouldn't know because that is something that's handled by the property manager, that's handled by the auditor. Our retainer agreement specifically says we don't get involved in the fiscal matters, so until somebody brings it to our attention, we would never know about something like that. The reason I ask it, because I've had a little exposure to these matters, and I recall the situation where the developer, once they reached the point where a sufficient number of condos were sold, then just turned control of the homeowners association back to the tenants, people that were there that owned the condos, and walked off with the reserves. I don't believe that's the case here. I think this is just a scenario where a few years later the association realized it was underfunded in reserves, and determined to take action. During the time period, there was absolutely nothing in the record that indicates that anybody knew anything about it. Well, the reserves come from homeowners' dues. The reserves come from the assessments. Assessments, yeah. I have a condo down in the desert. I pay a homeowner's fee, right? Yes, sir. And that amount, while the homeowners association is under the control of the developer, that amount is kept low. Generally not, Your Honor. Generally, most builders have gotten quite good at funding these things due to the extreme liability. In my experience, exactly the contrary. Well, I haven't been involved in anything like that personally. Oh, I'm going back maybe 40 years. That's what was going on then. The developer would keep those monthly payments down. Because people want to know, what is this going to cost me every month? I think the Raven's Cove and Occidental Land case, which came out I believe by 81 and 86, have done a wonderful job of getting builders to the kinds of cases I saw early in my career versus later in my career. I think builders have gotten a lot better at this issue. This one, for a variety of reasons, it's a very strange project. It did not occur that way, and that was discovered four or five years later, and legal action was brought. Reserve underfunding deficiencies almost are never discovered until later in the budget's reconciled. I think I've gone over my time, Your Honors. Well, it's all right. It's not an easy matter. Any questions? Good morning, Your Honors. Stuart Price on behalf of Centex Homes. Two issues. One is, was the firm properly disqualified? And the other is, given that it was disqualified, was it properly held in contempt when it continued to meddle in the case despite the court's order? Well, what did they do that was wrong? I've been trying to figure that out. Talking about the contempt citation? The whole case. Well, we'll start with... They were hired by the association for certain purposes, and one of the purposes was if people were behind, if condo homeowners were behind in their payments, they would get after them, see that those payments were made. Wasn't that one of the things? That's a purpose, sure. That is a purpose. In other words, they were bill collectors in that sense. People didn't pay their dues, and they'd get after them. That's not what the retainer agreement said. The retainer agreement, which is called a retainer agreement for general legal services, says in its recitals, board members of the association owe a fiduciary duty towards the association and its members under California law. To fulfill its duties and responsibilities, the association's board anticipates that it will require legal advice to assist the board members in the performance of their duties. That's the advice they took on to give. But this is a... So what's wrong with that? There's nothing wrong with that. But you can't do that and then later sue the board members. But duties as board members of the homeowners association, not duties as Semtex employees, right? Ravenscove says that... What board members did they sue? They did not sue any board members. I mean, come on. They did not sue any board members. They sued the developer. The developer. The developer was not a board member. Its employees were. Ravenscove... But their employees owed the fiduciary duty to the association. So you're telling me now that the developer put people on there and that their primary loyalty was to the developer and not to the homeowners association. No, I'm not saying that. Well, that's what you just said. That's what you just said. That's the way I understood it. Okay, so let me... Yeah, their employees of the developer. So they're going to take care of the developer and, you know, forgive me, you know, I don't want to use any other words, but, you know, so it's the developer now. If he thinks he's got control over this board and they all have a fiduciary duty to the homeowners, he's got a bad conflict too, hasn't he? The developer? Yeah. The people on the board, while they're sitting on the board and they're wearing their board hat, they owe a fiduciary duty to the association. They have to take action that's consistent with that duty, not take action that favors the developer, right? They have to act like board members. Well, so... The trouble that... You're saying... What are the things that... Go ahead. The trouble that Peters and Friedman got itself into was that it said in its retainer agreement that it was going to represent the board. That's what it says. That the board's going to need legal advice and we're going to give it. Then, a few years later, after giving that advice or agreeing to give it... Isn't that a pretty standard retainer-type agreement? I wouldn't say that. I wouldn't say that in a minute, Your Honor. If I'm going to represent a corporation, I'm not going to say I also represent the board. That's how you get sued. You have to decide. The first lesson I learned as a lawyer... What corporation did they represent? The association. The association. Correct. Okay. First lesson I learned as a lawyer, figure out who your client is. Be clear about that. It's the first lesson I learned. Where'd you learn that? Steve Drummey. Steve Drummey, he was my boss. Who was he? He was the managing partner of the firm at the time. What firm was that? Drummey, Garrett, King & Harrison. Never heard of them before. No, they were a local Orange County firm. What? They were a local Orange County firm, Your Honor. In any event, it was a good lesson to be learned. Who's your client? They could have represented just the association. The corporation that is the association. But they did not. They chose to represent also the board members. Also the board members. And then three years later, once control of the association had turned over... How'd they represent the board members? Because that's what the retainer agreement says. To fulfill its duties and responsibilities, the association's board anticipates that it will require legal advice to assist the board members in the performance of their duties. It's in the recitals of the... To come to the point, three years later, they sued Centex because its employees violated their fiduciary duties. Correct? Correct. Along the short of it, I think, you would say, ergo, they've got a conflict because they say Centex is liable because of the evil the employees did, but they were telling the employees what they could and couldn't do. Is that your point? I would put it... It's very close to my point. My point is, Peters and Friedman signed a complaint that said that the duties of the board members were the same as the duties of the corporation. Yes. Right? And so when they did that... That's their theory, that's not our theory. When they did that, they created their own conflict. That's what they did wrong. Right from the beginning. And you win or lose on that, basically, do you not? Or at least you lose if that's not true. I wouldn't agree with that. Because we have three other places where there was representation. Can I just point this out? I cannot hear your question. I don't hear your question, so when he answers... I don't know what he's talking about. All right. Yeah. What was the question? The question that he asked was, if I lose on the issue about whether Peters and Friedman found itself in a conflict position because it was suing Centex for the conduct of the board members, do I lose? Do I lose the whole game? And my answer to the question is, that's the central issue here on the appeal. The contempt stuff is easy. They clearly violated the court's order. That's the central issue here. But we have other instances where there was direct representation of Centex. They send a management agreement with a legal analysis to a Centex employee who never sat on the board. There's no evidence in the record that Sandy Duff sat on the board. So they review this management agreement, they provide legal advice, and that's all to Centex. And then they later sue Centex for mismanaging the association. So I don't think I lose if I lose on the most fascinating issue in the case. Let's go to contempt. And then I'll reserve a few minutes. Oh, I guess I don't get to do that, do I? Let's go to contempt. That part's pretty easy. You make some facetious statements like that, you might be held in contempt. Go ahead. I don't get to reserve, do I, Your Honor? What? What did you say? I said I don't get to reserve, do I? You'll get a fair hearing. If you need more time, I'll give you more time. I do not need more time. Is that what you want? No, I do not. Just ask for it. You don't have to. No, I wasn't being facetious. You don't have to be facetious, yeah. I have plenty of time. Yeah, yeah, okay. I have plenty of time. Yeah. The district court's order was clear. Cease all representation in the action and turn over all the files. Cease all representation and turn over the files. They didn't cease all representation. A few weeks later, they're writing us letters about a subpoena we issued in that case, complaining about the scope of the subpoena, the documents we got. It's very clear they were meddling in the case. They had other options. Well, wait a minute. Now, are you talking about these documents that somehow were inadvertently transferred? I'm talking about- Turned over. That was the result of the subpoena. I'm talking about the subpoena that was issued. It was the result of the subpoena. All those documents that shouldn't have been turned over were turned over. Correct. Right. Now, what did you do to correct that situation? As soon as we saw that there were potentially privileged documents, we stopped looking at them and we wrote counsel and notified them. And did you turn them over to counsel? Did you return them from whence you got them? We asked for a list of the documents that they contended were subject to a privilege and they did not give it to us. Well, how would they know what you had unless they saw it all or you gave them a list? Did you give them a list? Well, they had a copy of the documents. The documents were produced on a CD and the CD was given to the lawyers on the other side. All right, so you had the CD? Yes, Your Honor. So you knew what the documents were? You knew which documents were there, were incorrectly turned over to your client and to you. Well, that's actually not the case because when we... You know, I'm just... I don't have all the details in my mind like you have in yours. I've got a lot of cases to look at at the same time. But you did get documents that you knew did not belong to you. And we stopped looking at them. Or your client. Well, you say you stopped looking at them. Well, we did. So you knew what those documents were. And you knew that you got them wrongly. Someone made a mistake. So why didn't you just... You looked at them. You knew that they didn't belong there. Why didn't you just call them up? There's a procedure that's laid out in the court, in the lower court, and the procedure is we notify them that we have them and we ask them to give us a list of the documents they contend are privileged. We've not gone through the whole CD. The moment we saw that there was a potentially privileged communication, we stopped our review. That's what's in the record. And we told them. All right. And there was a really difficult issue about whether they were privileged in the first place. This property management company was no longer the property management company. They're just a stranger in the world. A new management company came in and they just turned all this stuff over in response to your subpoena. Correct. And then you knew you got stuff that you shouldn't have received. So, for example, if I have communication... Is that right? You knew you got material you shouldn't have received. I knew I had material that someone would claim was privileged. There was a very interesting issue about whether it was or whether the privilege had been waived. Oh, so now we're getting more complicated, huh? But that was the issue. The issue was whether the fact that the property management company... In other words, you were going to take advantage of someone's incompetence that sent you all this. Your Honor, that's not true. When we saw that there was potentially privileged material in those documents, we stopped looking at them. And that's what we were supposed to do. Just close your eyes, huh? Why didn't you turn those back to the party from whence you got them? This new association. They're the ones that made the mistake. Correct. Yeah. So you knew they made a mistake, so you could have just turned them back to them. That's not the procedure. The procedure is that the court rules require... Well, I'm talking about what the right thing to do would have been. If I got something and I knew someone sent it to me by mistake, I'd just send it back to them. You know, Judge Phillips looked at that issue very carefully, and she decided not only had we not done anything wrong, she found that... I'm just talking to you now. Fair enough. Okay? Yes. There's a lot that bothers me about this case. We felt like we did the right thing. We stopped looking at the materials, and we asked them to explain to us whether they thought the materials were privileged, and if so, which ones. So now you're going to say, I'm going to take advantage of that mistake. We got them. Now, you know, you've got to show me that they're privileged. Otherwise, I'm going to keep them. But not look at them. What? But not look at them. Well, they're supposed to take your word for it, huh? You're not going to look at them. I'll close with this. Perhaps on the heels of that, this isn't the right way to close, but... Perhaps on what? I will close with this, Your Honor. What Peters and Friedman did is they took on the representation not only of a corporate association, a corporate homeowners association, but its board. And then later, they sued the employer of that board. I'm sorry, the employer of the majority of the people that sat on that board and said that the employer and those people that sat on the board were one and the same, that their duties were its duties, that their breaches of duties were its breaches of duty. That is way too close to the line of whether a duty of loyalty had been undertaken and whether counsel was creating the appearance of impropriety. I think if you ask the man on the street whether this is what he would expect of a lawyer, the man on the street would say, that doesn't sound right to me. That sounds like hair splitting. Isn't that what you're doing? In what regard, Your Honor? In regard to those documents that you got, that you knew were sent to you by mistake. And then all of a sudden, well, maybe they're not privileged. Maybe we keep them. I don't know that the man on the street would agree with you. Okay. Any other questions, Your Honors? I have nothing further. I hate to see you. Leave. I'm having such good time here. Okay. Thank you. Go ahead. I mean, your reputation is at stake. Your law firm is at stake. Your peace of mind is at stake. I don't think you have any idea how much this hit the web. It hit everything that I've been disqualified for this kind of regard. And the fact is, they got the documents. They wouldn't give them back. They said, I'm not giving them to you. You're not letting the attorney under federal court. Therefore, you can't take an action in state court. And by the way, you have all of our opinions and comments regarding the construction defect, which frankly was the far bigger case. I don't know what you do. So, that lawsuit about the defect and claiming about the defect in construction that was already had been filed. That had already been filed. That had been filed. They had that. So, you were adversaries with the law firm. Those two, yeah, those two law, no, it's actually a different law firm who is representing on the construction defect. They just obtained a CD with all the attorney-client privilege inadvertently from a prior management company, which that CD had all of the construction defect updates. So, we were very clear saying, we only want the construction defect updates, attorney-client privilege stuff returned. And they said, no, we're not giving it to you. Number one, it's waived. Number two, you can't do anything because this is, this is a federal action and, you know, the documents you have, you're prohibited from doing anything. I have no idea what we, what to have done at that point in time, except to try to get a discovery referee. And this is at a time when the construction defect litigation was going on in state court? Yes. The construction defect case, I believe, started right before it. And it was, and that's going on at the exact same time. So, we've gotten disqualified from one, not from the other. We researched the heck out of it, and I was scared to death that, that the disqualification did not mean disqualification on the other. So, we did that. We then, they get all these records, and we can't get them back. And they got these records in, like, May of 2012, and it took until, federal magistrate, until November 12th, 2006, months later, before they actually would give them back. They were taking advantage of it. And I think I commit malpractice if I do nothing. When did you find out that they got these documents? I believe sometime in July. And I wrote a couple letters. It's in the file. I got a response back. I went ex parte into state court, state, the state court. Frankly, it was, well, I wasn't sure whether this should be within the ambit of the federal or not federal. Declined to take any action. The new law firm, in connection with the federal action, started, took action. Then, all I know is they filed a motion, and they filed a response. And I find out three days later, I got three days to determine why I'm not in contempt, asking for hundreds of thousands of dollars in fees. I'm just not sure, you know, and maybe this is just beyond my skill level or sophistication, but I'm plain simple. You have my documents in the construction defect, my reports to the board. You've got to give them back. And that, to me, is pretty simple. I want to address the retainer agreement just for a second. I think it's a mischaracterization of retainer agreement. We represent, Let's use the microphone, okay? I want to address the retainer agreement for a second. That's a mischaracterization of the retainer agreement, that we represent the individual board members. There's no such thing as a corporation that doesn't have a board. So you are, if you're representing a corporation, you're answering the board. Clearly, we give advice to a board on virtually any subject. Now, what's missing from this record is a single scintilla piece of evidence that shows that we give any advice regarding any of the issues. They're trying to say, assessment of a collection of two accounts is advice, or a developer's checklist, which has nothing to do with the case, and frankly wouldn't benefit them, is advice. There is no advice. Attending four board meetings, open meetings, in front of the public and the membership, there's no confidential advice. There's no advice whatsoever. The fact is, the record, admittedly, indicates that no one heard or figured out a single thing regarding the finances of this project for many years later, and it would never have been the attorney. You know, despite the fact that the retainer agreement says your fiscal, that we don't give advice on finances, fiscal, this has somehow morphed into where we have, I guess we have a duty to be the accountant, the management, to be involved in every aspect of all that stuff. That doesn't happen in the real world. The real world is you send over an agreement, they call you when and if they need you. They didn't call because there was nothing to call about on any issue, and so what you have is you have some language in a recital that has somehow morphed into the best argument they have to now have us disqualified, and then you have a contempt argument that was because we pursued documents in the state court for the construction defect, attorney-client privilege information, which we were later vindicated, and I'm held in contempt and all over the web, and this has been terrible, and I think it's wrong, and I'm still sitting here today, haven't quite figured out what we did wrong, and I am big about mea culpa. I've made all sorts of mistakes. I just don't get this one. I apologize. No, I'm glad you, you know, I like to see the human side of these cases. Thank you. So what you're saying is that you attended, what, two board meetings? Open board meetings. Open board meetings. That's where the whole member's there, and two membership meetings. And two membership meetings, and that's all, and then the advice you gave was that list of subs? No. I gave a developer's checklist to the property manager, who he got from a seminar, and the seminar, you know, what's really sad is I would love to have made a better record, but within three days, I just wasn't good enough to pull up everything. I would love to have been able to show the actual seminar document, which shows David Peters speaking about how an association should get documents before the builder goes ahead and gets out of Dodge. I mean, that's what the document was for. There's not the slightest benefit to a builder for having, why would a builder want to give all this information regarding their subs bond information, stuff that if an HOA doesn't even know about, they won't go after them for. There's nothing there. There's nothing there. And what was the other list? Well, that was the list. There was a letter to, a draft letter sent to your draft, which may or may not have been sent. I don't know if it was sent. I don't care. All it was is a letter that basically was directed by the board to send. It says, here's your management company contract. Apparently they delegated authority to somebody regarding the management contract. I thought that person was on the board, frankly. My records show it. I think the letter says it. But I don't even know if the letter was sent. And even if it was sent, so what? It has nothing to do with syntax. It just has to do with a provision in a management agreement regarding how the association, how many meetings they're going to attend, that kind of stuff. And this has morphed into giving financial advice regarding fiduciary obligations. Now, if they'd gotten up there and said, hey, Mr. Peters gave us a long seminar and pulled Jane Carillo aside and said, look, you can't do this, and then she went and did exactly what you're supposed to, maybe they have a tangential argument. But there's no evidence. There's none. All we have is these big leaps. I don't get it. And then when you get dumped or get disqualified and they have documents, I don't know how an attorney allows all of its information. And by the way, I'm not the attorney of record anymore. I can't go into federal court. Do you know when I had to file my response for the contempt, I couldn't even file an e-serve. I had to figure out a way to get a hand serve up there. I couldn't go through his procedure with federal court to even find out what they had. That's a farce. It's not fair. I'm sorry. No, it's all right. All right. Thank you. Thank you. This matter is submitted.
judges: Pregerson, Fernandez, Nguyen